**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

ALICIA ARMAS,
*individually and on behalf of all*
*others similarly situated*,

        Plaintiff,

v.                              **Case No. 0:25-cv-61310-AHS**

PELOTON INTERACTIVE, INC.,

        Defendant.

_____/

**DEFENDANT PELOTON INTERACTIVE, INC.'S**
**<u>MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT</u>**

Pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(1), Defendant Peloton Interactive, Inc. ("Peloton"), by and through undersigned counsel, respectfully files this motion to dismiss the First Amended Class Action Complaint (the "Amended Complaint") (D.E. 21) filed by Plaintiff Alicia Armas.

**INTRODUCTION**

Plaintiff filed this putative class action in June 2025 when she allegedly received unwanted text messages promotions that month to the cell phone number that she had previously provided to Peloton for those purposes. Plaintiff's Amended Complaint should be dismissed because it fails to state causes of action under the federal Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") (Counts I and II) and the state Florida Telephone Solicitation Act, Fla. Stat. § 501.059 ("FTSA") (Counts III and IV).

Count I, asserting a claim under TCPA Section 227(c), fails because her claims are outside the scope of the statute. The TCPA was enacted before text messages existed, and the plain language of Section 227(c) applies only to telephone *calls*, not to *text messages*. No calls are alleged here. In June 2025, the Supreme Court held that courts should interpret statutes without deference to the FCC's prior interpretation of the TCPA and case law relying on it, and since then at least two courts (including one in this Circuit) have held that text messages are outside the scope of Section 227(c). Even if Section 227(c) applied to text messages, it (as well as the do-not-call regulation on which Plaintiff expressly relies, 47 C.F.R. § 64.1200(d)), unambiguously applies only to telephone calls to *residential telephone subscribers* and does not apply on its face to text messages sent to *cell phones*.

Count II, asserting a claim TCPA Section 227(b), fails to plausibly allege that Peloton used a "random or sequential number generator" as part of a "automatic telephone dialing system" ("ATDS") to locate and text Plaintiff. As conceded in the Amended Complaint, Plaintiff consented to receive text messages from Peloton, and the messages were sent to the cellphone number she voluntarily provided to Peloton, not a randomly or sequentially generated number (*e.g.*, random strings of ten digits or sequentially (*e.g.*, 305-555-0001, 305-555-0002, and so on)).

Having failed to allege federal claims under Counts I and II, the Court can decline to exercise supplemental jurisdiction over the state-based FTSA claims (Counts III and IV) and dismiss the remainder of the complaint for lack of jurisdiction under FRCP 12(b)(1). Should the Court elect to retain jurisdiction, those claims also fail under 12(b)(6) because the FTSA is

unconstitutional both facially and as applied to Peloton. The terms "automated system for the selection and dialing of telephone numbers" and "telephonic sales call" are unconstitutionally vague, leaving a reasonable person unable to determine what conduct is regulated by the statute. The FTSA also violates the Dormant Commerce Clause by, in effect, requiring nationwide compliance with a Florida statute, as, given the mobility of cellphone subscribers, it is impossible to know if any text message is sent to a Florida resident. Lastly, because the FTSA imposes content-specific prohibitions on speech, it is facially unconstitutional under the First Amendment.

For all of these reasons, and as further explained below, the Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff does not allege that Peloton ever called her. Rather, according to the allegations in the Amended Complaint,[1] Plaintiff received a text message on her cellphone inviting her to participate in a Peloton "Spring Kickoff Event" promotion. Am. Compl. ¶ 8. Plaintiff does not deny that she consented to receiving text messages from Peloton. Instead, Plaintiff concedes that she consented, alleging only that she "reasonably revoked her consent to receive text messages from" Peloton. *Id.* ¶ 14.[2] On or about March 26, 2025, Plaintiff responded to a text message with the word "stop" and received confirmation that she was unsubscribed from promotional messages. *Id.* The message also said: "If you need assistance, please contact us at 866-679-9129 from 6am–12am ET, 7 days a week." *Id.* Plaintiff alleges she began receiving texts again two months later, and received approximately 22 additional marketing messages in all—though she identifies only four with screenshots, and only three by date sent (June 15, 16, and 18, 2025). *Id.* ¶¶ 9–11. Plaintiff does not allege that she sent a second "stop" message or that she called the assistance number provided by Peloton. Instead, on June 27, 2025, she filed the initial class action complaint (D.E. 1), which she amended upon Peloton's filing of its initial motion to dismiss.

## LEGAL STANDARD FOR A MOTION TO DISMISS

A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint. *Milburn v. United States*, 734 F.2d 762, 765 (11th Cir. 1984). The determinative issue on a motion

---

[1] Solely for purposes of Fed. R. Civ. P. 12(b)(6) and this motion, Peloton assumes the truth of well-pleaded facts and inferences contained in Plaintiff's Amended Complaint.

[2] Should the case proceed, Peloton will demonstrate that Plaintiff did in fact provide prior consent to receive promotional text messages.

to dismiss is "whether the allegations in the complaint, accepted as true, state a claim to relief that is plausible on its face." *Hayes v. U.S. Bank Nat'l Ass'n*, 648 F. Appx. 883, 887 (11th Cir. 2016) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, the factual allegations in the complaint must be sufficient to raise a right to relief above the speculative level." *Id*. (internal quotation marks omitted). Here, the Amended Complaint is legally insufficient, states no plausible claim for relief, and should be dismissed.

## ARGUMENT

**I.   Count I Should be Dismissed as TCPA Section 227(c) Does Not Apply to Text Messages or to Cellular Phones**

Plaintiff alleges that Peloton violated TCPA Section 227(c)(5) by sending unwanted text messages to her cellphone after she had previously consented. Am. Compl. ¶¶ 8–15, 59–61. However, on its face, that subsection of the TCPA applies only to *telephone calls*, not to *text messages*. Nor does Section 227(c)(5) apply to *cellular telephones*, but instead only to *residential landlines*. Neither phone calls nor residential landlines are alleged here.

### A.   TCPA Section 227(c) does not prohibit sending text messages

The TCPA was enacted in 1991 before text messages existed, and Section 227(c) makes no mention of text messages. When interpreting a statute, courts begin with the plain text. *Jimenez v. Dep't of Homeland Security*, 119 F.4th 892, 906–07 (11th Cir. 2024). The language of Section 227(c) unambiguously applies only to telephone calls, not text messages. Section 227(c) creates a private right of action only when a person "has received more than one *telephone call* within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5) (emphasis added).

The meaning of "telephone call" cannot be stretched to encompass the entirely different process of text messaging. Section 227(c)(5) explicitly refers to a "telephone call," which can and should be interpreted as it is commonly understood: distinct from a SMS (text) message. *See Nielsen v. Preap*, 586 U.S. 392, 407–08 (2019) ("Because words are to be given the meaning that proper grammar and usage would assign them, the rules of grammar govern statutory interpretation unless they contradict legislative intent or purpose.") (cleaned up). "Text messaging was not an available technology in 1991, when the TCPA was enacted and thus 'telephone call' would not have included text messages or SMS messages." *Jones v. Blackstone Med. Servs., LLC,* No. 1:24-CV-01074-JEH-RLH, 2025 WL 2042764, at *4 (C.D. Ill. July 21, 2025) (citing Alex Fitzpatrick, *How Text Messages Are Being Killed and Replaced*, TIME (Dec. 3, 2014),

3

https://time.com/3612277/text-message-history-future/ ("The world's very first text message, sent Dec. 3, 1992, was a cheerful, if early, holiday greeting: 'Merry Christmas,' it read, short and sweet.")).

Congress also reaffirmed that Section 227(c) only relates to telephone calls, not text messages, because it has twice amended other provisions of the TCPA to explicitly reference text messages but chose not to amend 227(c) for those purposes.

In 2018, Congress amended other portions of the TCPA to explicitly define "text message" and "SMS"[3] but did not extend those definitions to 227(c). Instead, Congress amended Section 227(e), titled "Prohibition on provision of misleading or inaccurate caller identification information," to explicitly refer to text messages. Section 227(e)(1) now provides: "It shall be unlawful for any person [] in connection with any voice service or *text messaging service*, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value." (emphasis added). The definitions in 227(e) are solely "[f]or purposes of this subsection," *i.e.* Section 227(e). 47 U.S.C. 227(e)(8). In addition to explicitly being confined to Section 227(e), the words "text messaging service" do not appear in Section 227(c).

Similarly, in 2019, Congress enacted the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, PL 116-105, December 30, 2019, 133 Stat 3274 (the "TRACED" Act), amending Section 227(e) but not amending 227(c). The TRACED Act incorporated the definition of text message from 227(e)(8) that had been created in 2018 (discussed above), into 227(i). While 227(i) can be read as recognizing that 227(b) can regulate text messages, there is nothing in the TCPA—including the amendments in 2018 and 2019—that extends 227(c) to texts. 227(c) does not cross-reference 227(i), 227(b), or 227(e)(8). Congress easily could have extended Section 227(c) to text messages. It chose not to. "It is for Congress to respond to the issues presented in this case and to address the realities of today's technology (and the intrusions caused therefrom) which is commonplace in American life in 2025." *Blackstone*, 2025 WL 2042764 at *5. Unless and until Congress decides to incorporate text messaging into Section 227(c), litigants are bound to the existing language, and the Amended Complaint must be

---

[3] Consolidated Appropriations Act, 2018, Pub. L. No. 115–41, s 503, 132 Stat. 348, 1091–92 (2018), amending 47 U.S.C. 227(e)(8)(A)–(E).

dismissed on this basis. *See also Davis v. CVS Pharmacy, Inc.*, Case No. 4:234-cv-477, 2025 WL 2491195, *3 (N.D. Fla. Aug. 26, 2025).

**B.      TCPA Section 227(c) only applies to residential landlines, not cellular phones**

Count I should also be dismissed for the independent reason that the Amended Complaint does not plausibly allege that Plaintiff is a "residential telephone subscriber" as required by Section 227(c), instead only alleging contact with her cellular phone. Both the Supreme Court and Eleventh Circuit have recognized the statutory distinction between residential phones and cellphones, including under the TCPA. *See Facebook, Inc. v. Duguid*, 592 U.S. 395, 407 (2021) (clarifying that the TCPA "separately prohibits calls using 'an artificial or prerecorded voice' to various type of phone lines, including home phones and cell phones," and treats residential phone lines as distinct from cellular phone lines); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250 (11th Cir. 2014) (differentiating between residential phones and cell phones when analyzing the statutory intent behind the phrases "intended recipient" and "called parties"); *Breslow v. Wells Fargo Bank*, 755 F.3d 1265 (11th Cir. 2014) (affirming ruling of the district court that explained that "practical realities support a distinction between residential and cellular lines").

Section 227(c) does not include reference to cellular phones and instead, instructs the FCC to adopt rules to protect "residential telephone subscribers":

> [T]he Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights . . .

47 U.S.C. §227(c)(1); *see also* 47 U.S.C. §227(c)(2) ("[T]he Commission shall conclude the rulemaking proceeding initiated under paragraph [(c)](1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph. . .."). Because the "regulations prescribed under this subsection" refer explicitly to "protect[ing] residential telephone subscribers' privacy rights," Plaintiff's claims cannot proceed as a matter of law unless she is a "residential telephone subscriber."

Congress' intent to limit Section 227(c) to residential landlines and not to cell phones is confirmed by reviewing Section 227(b) which explicitly includes "cellular telephone[s]" within its scope.  227(b) applies, inter alia, to calls "to any telephone number assigned to a paging service, *cellular telephone service*, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." (emphasis added). On the other hand, Section 227(c) directs the FCC to enact regulations that "may require the establishment and operation of a single national database to compile a list of telephone numbers of residential

subscribers who object to receiving telephone solicitations" and to limit calls to such subscribers. 47 U.S.C. § 227(c)(3). The use of different terms in 227(b) and (c) is consistent with Congressional intent. As a matter of public policy, "Congress found that automated or prerecorded telephone calls [regulated under Section 227(b)] were a greater nuisance and invasion of privacy than live solicitation calls [regulated by Section 227(c)]." 2003 Order, *infra* n. 2, at ¶ 165.

> C.       **This Court is not bound by the FCC's interpretation of the TCPA.**

Plaintiff may argue that the FCC's prior interpretation that a text message is a "telephone call" controls here, but that is not entitled to any deference after the Supreme Court's recent decision in *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S.146, 160–61 (2025). For the same reason, pre-*McLaughlin* case law relying on the FCC's interpretation is no longer good law. Rather, the Court must independently assess the intention of Congress in enacting Section 227(c)(5), *McLaughlin* 606 U.S. at 168, which for the reasons discussed above demonstrates that Count I should be dismissed.

In 2003, the FCC paraphrased Section 227(b) by stating that "under the TCPA, it is unlawful to make any call using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number." *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, at 165 (2003) (the "2003 Order") (citing 47 U.S.C. § 227(b)(1)). The FCC then improperly expanded the scope of the TCPA, without any citations or analysis, by stating that "[t]his encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service." *Id.* Later, the FCC adopted 47 C.F.R. 64.1200(e), which states that the rules set forth in "paragraph (c) and (d) of [Section 227] are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers to the extent described in the [2003 Order]."

The 2003 Order is not entitled to any deference after the Supreme Court's June 2025 decision in *McLaughlin,* expressly holding that Courts *are not required* to defer to the FCC's interpretation of the TCPA. Thus, following *McLaughlin*, this Court must independently—and without deference to the FCC's decision—evaluate whether text messages sent to cellphone numbers are within the scope of Section 227(c), despite that section's reference only to telephone calls made to residential telephone subscribers and Congress' other amendments to the TCPA. *See, e.g. Blackstone*, 2025 WL 2042764, at *4–5. For the reasons discussed above, and based on a plain

language and logical reading, this Court should reject any argument that Section 227(c) applies to text messages or cellular phones, and dismiss Count I as deficient as a matter of law.

At least two District Courts, including one within this Circuit, have since relied upon *McLaughlin* to rule that because deference is not afforded to an agency regulation, the plain language of the statute controls, and Section 227(c) does not apply to text messages. *See Blackstone*, 2025 WL 2042764, at *4 ("Text messaging was not an available technology in 1991, and thus 'telephone call' [in Section 227(c)] would not have included text messages or SMS messages."); *Davis*, 2025 WL 2491195, *4 ("To succeed on his [TCPA] § 227(c)(5) [claim], [plaintiff] had to allege that he received at least two 'telephone calls.' He alleged receiving only text messages. And because text messages are not telephone calls, he has not stated a claim.").

Plaintiff has pointed to *Bosley v. A Bradley Hosp'y LLC*, No. 25-cv-22336, 2025 WL 2686984, at *13 (S.D. Fla. Sep. 18, 2025) (Bloom, J.), for the authority that "long-standing precedent holds that the TCPA applies to text messages." [D.E. 31 at 2]. The defendant in *Bosley* did not contest the applicability of Section 227(c) to text messages, and neither party brought the *McLaughlin* ruling to Judge Bloom's attention. Moreover, each of the cases cited by *Bosley* relies on the FCC's 2003 Order and its progeny, and to the extent that they do so, those cases are no longer good law in light of *McLaughlin*. While *Bosley* cites to *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016), as revised (Feb. 9, 2016), that 2016 decision noted without discussion that Section 227(b) of the TCPA applies to text messages, not Section 227(c).[4]

**D.      The FCC has not enacted a regulation applying Section 227(c) to text messages**

Even if this Court were required to defer to the FCC's interpretation of the TCPA (it is not), the FCC's own pronouncements make clear that, to the extent the TCPA and its regulations apply to text messages, text messages are governed only by Section 227(b), not 227(c). Section 64.1200(e) purports to apply 227(c) and (d) to text messages to "the extent described in [the 2003 Order].'" As noted above, the 2003 Order only addressed text messages sent using "an automatic telephone dialing system or an artificial or prerecorded message"—a practice regulated by Section

---

[4] Even prior to *McLaughlin*, the Supreme Court reopened the question of whether Section 227(b) even applies to text message in *Duguid*. See 592 U.S. 395, 400 n. 2 (The Supreme Court has also noted that "[n]either party disputes that the TCPA's prohibition [under 227(b)] also extends to sending unsolicited text messages. We therefore assume that it does without considering or resolving that issue.") (*citing Gomez*, 577 U.S. at 156).

227(b), not Section 227(c). *Id.* ¶ 165. In fact, that paragraph cites only to Section 227(b) of the TCPA and Section 64.1200(a) of the regulations—**not Sections 227(c), 64.1200(c), or (d).** *Id.* Thus, the 2003 Order cannot be relied upon to support a finding that text messages are regulated by Sections 227(c), 64.1200(c), or (d).

Notably, the phrases "text message" and "SMS message" are wholly absent from the regulations implementing Section 227(c)—regulations Sections 64.1200(c) and (d). Rather, the regulations use the terms "telephone call," "artificial or prerecorded-voice telephone call," and "call." 47 C.F.R. §§ 64.1200(c), (d). The FCC could have included the term "text message" or "SMS message" in these provisions, but chose not to do so.

Elsewhere in the regulations, the FCC clearly indicated its intent to regulate text messages under Section 227(b) (as opposed to Section 227(c)), writing:

> As used in this paragraph (a)(9), the term 'call' includes a text message, including a short message service (SMS) call.

47 C.F.R. § 64.1200(a)(9). Importantly, Section 64.1200(a) was implemented under Section 227(b) only, and *not* Section 227(c). Thus, by limiting this definition to Section 64.1200(a), the FCC clearly indicated that, unless otherwise specified, a "call" does not include a "text message" or "SMS message." If "call" did generally include text messages or SMS messages, the FCC would have no reason to include a definition of "call" in this circumstance—it would have no effect. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, THOMPSON/WEST (1st ed 2012), at 174 ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*).").

Clearly, the FCC could have included "text message" or "SMS message" within the definition of a "call" in other sections as it did in Section 64.1200(a)(9) implementing 227(b), but chose not to do so. The FCC intentionally omitted text messages or SMS messages from its regulations within Section 64.1200(c) and (d) (implementing 227(c)). Section 227(c), therefore, does not regulate text messages or SMS messages.

## II. Count II (TCPA Section 227(b)) must be dismissed for failure to plausibly allege Peloton used an "Automatic Telephone Dialing System"

Count II, asserting a claim TCPA Section 227(b), fails to plausibly allege that Peloton used a "random or sequential number generator" as part of a "automatic telephone dialing system" ("ATDS") to locate and text Plaintiff. As conceded in the Amended Complaint, Plaintiff consented

to receive text messages from Peloton, and the messages were sent to the cellphone number she voluntarily provided to Peloton, not a randomly or sequentially generated number.

Section 227(b) of the TCPA regulates the use of an "automatic telephone dialing system" to place calls to phone numbers assigned to a cellular telephone service. ATDS is defined as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.SC. § 227(a)(1). The Supreme Court in *Duguid* ruled that "Congress' definition of an autodialer[5] requires that in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator," 592 U.S. at 397, *i.e.* if it generates phone numbers to be called randomly (*e.g.*, random strings of ten digits) or sequentially (*e.g.*, 305-555-0001, 305-555-0002, and so on).[6] The Supreme Court also clarified that this definition cannot be stretched to include "any equipment that merely stores and dials telephone numbers." *Id.* at 396. Therefore, "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called." *Id.* at 405. This definition necessarily excludes equipment that does not use a "random or sequential number generator" to store or produce numbers, such as automated systems that make calls to specific individuals "whose numbers were compiled into a preproduced list of phone numbers, as opposed to generated randomly by an autodialer." *Samataro v. Keller Williams Realty, Inc.*, No. 1:21-cv-76-RP, 2021 WL 4927422, at *4 (W.D. Tex. Sept. 27, 2021) (dismissing claims relating to the use of an ATDS with prejudice post-*Duguid*.).

To sufficiently plead the ATDS element of her claim, Plaintiff "may not merely recite the statutory elements of the use of an ATDS or prerecorded voice without alleging additional facts to

---

[5] "Autodialer" is not synonymous with ATDS. The Supreme Court's use of "autodialer" as shorthand for "automated telephone dialing system" in *Duguid* does not mean that *any* "autodialer," as more colloquially used, is necessarily an ATDS under the TCPA. However, the use of "autodialer" within the *Duguid* decision should be treated as synonymous with ATDS under the TCPA for purposes of the analysis within the *Duguid* decision.

[6] This practice was common at the time the TCPA was enacted in 1991 but the Supreme Court has recognized it is not widely used anymore. The Supreme Court observed in 2001 that while this technology may be "senescent," the text of the TCPA cannot be stretched to apply to more modern calling technology such as calling stored lists of known phone numbers. *Duguid*, 592 U.S. at 397.

support those facts." *Adams v. Ocwen Loan Servicing, LLC*, 366 F. Supp. 3d 1350, 1355–56 (S.D. Fla. 2018) (citing *Johansen v. Vivant, Inc.*, 2012 WL 6590551, at *3 (N.D. Ill. Dec. 18, 2012) ("Use of an ATDS and the pre-recorded nature of the messages are not legal conclusions, they are facts. Still, when a fact is itself an element of the claim, as is the case here, it is not sufficient to recite that fact verbatim without other supporting details.")).

The Amended Complaint here does nothing more and to the contrary, concedes that Peloton sent a text message to the phone number she provided, not a randomly or sequentially generated number, negating Count II. *See* Am. Compl. ¶ 14. Where a plaintiff "has alleged no facts establishing the technological capabilities of the device used by [the defendant] to place calls to [her] cellular phone, the Court cannot draw a reasonable inference that the device was an ATDS." *Joseph v. ARS Nat'l Servs., Inc.*, No. 1:13-cv-04123-JEC-RGV, 2014 WL 12774686, at *5 (N.D. Ga. Feb. 21, 2014); *see Watts v. Emergency Twenty Four, Inc.*, No. 20-cv-1820, 2021 WL 2529613, at *3–5 (N.D. Ill. Jun. 21, 2022) (dismissing claim relating to the use of an ATDS as insufficiently pleaded where plaintiff asserted that the defendant's dialing equipment was capable of calling thousands of individuals a day, stored numbers of individuals who did not consent to be called, and called plaintiff and others continuously at all hours); *Freidman v. Massage Envy Franchising, LCC*, No. 3:12-cv-02962-L-RBB, 2013 WL 3026641, at *2–3 (S.D. Cal. Jun. 13, 2013) (finding that plaintiffs' allegations were insufficient to establish use of an ATDS because it was "just as conceivable that [they] were done…not using an ATDS").

Rather than point to any plausible facts about the technical capabilities of Peloton's system, Plaintiff instead improperly concludes based solely upon the isolated use of the word "automated" in Peloton's Terms of Service that the platform Peloton utilizes to send marketing text messages to subscribers meets all of the statutory qualifications of an ATDS. *See* Am. Compl. ¶ 28 (citing to www.onepeloton.com/terms-of-service). But the word "automated" does not support an inference that *phone numbers* are generated randomly or sequentially. In fact, the Peloton Terms of Service Plaintiff relies on makes clear that Peloton only sends marketing text messages to specific cellular telephone numbers provided by users who request such texts: "**If you opt in** to 'Peloton Apparel' text messages, you will receive text messages from Peloton Apparel. 'Peloton Apparel' text messages are recurring automated transactional, promotional and personalized marketing text messages (e.g. cart reminders) from Peloton **at the cell number used when signing up.**" (emphasis added). Plaintiff's experience is consistent with this: Plaintiff admits that she

10

requested to be texted, not that she received texts through a campaign aimed at random or sequential numbers. Instead, she alleges that "Plaintiff reasonably revoked her consent to receive text messages from Defendant." Am. Compl. ¶ 14. As the only plausible inference from Plaintiff's experience and bare allegations relying on Peloton's Terms of Service is that Peloton sent text messages to a list of known phone numbers, not random ones, Count II should be dismissed.[7]

### III. The Court Should Decline to Exercise Supplemental Jurisdiction over the FTSA Claims (Counts III and IV)

Federal courts are courts of limited subject-matter jurisdiction. *Thermoset Corp. v. Bldg. Materials Corp. of Am.*, 849 F.3d 1313, 1317 (11th Cir. 2017). For that reason, a court must ensure that "jurisdiction exists over a case, and should itself raise the question . . . at any point in the litigation where a doubt about jurisdiction arises." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001); *DeRoy v. Carnival Corp.*, 963 F.3d 1302, 1311 (11th Cir. 2020) (citing *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999)). Should the Court dismiss Counts I and II under the TCPA for the reasons stated above, it need not retain jurisdiction over the remaining state law claims (Counts III and IV) under 28 U.S.C. § 1367. *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997) (A district court may decline to exercise supplemental jurisdiction state law claims if "the district court has dismissed all claims over which it has original jurisdiction."). In fact, the Eleventh Circuit encourages such practice, especially when there is no prejudice to the parties. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").[8]

Once all federal claims have been dismissed, "considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Baggett*, 117 F.3d at 1353 (citing *Palmer v. Hosp. Auth. of Randolph Cnty.,* 22 F.3d 1559, 1569 (11th Cir.1994)). It is in the interests of judicial economy and convenience to have the

---

[7] In her Opposition to Defendants' Motion to Stay and Bifurcate Discovery, Plaintiff provides a lackluster argument to refute this point, citing to this Court's opinion in *Petrovich v. Yf FC Ops., LLC,* No. 24-60825-CIV, 2025 U.S. Dist. LEXIS 86189, at *6 (S.D. Fla. May 5, 2025). However, Peloton's terms are easily distinguished from those cited by *Petrovich*, where defendant's website specifically mentioned utilizing an "automatic telephone dialing system." *Id*.

[8] Given that this case is still in the pleading stage, Plaintiff will not experience prejudice from state-law claims being dismissed for lack of jurisdiction.

state court adjudicate the claims under Florida law. *See, e.g.*, *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, n. 7 (1988) ("When federal law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."). As the procedural history is short and the record in this case is not yet developed (discovery has not been exchanged, the rulings made thus far have been limited to preliminary matters, and the only motion pending is regarding scheduling), there is no necessity for this Court to retain jurisdiction over Plaintiff's FTSA claims.  Because Plaintiff cannot sustain either of her federal claims (Count I and II), this Court need not consider the remaining state law claims (Counts III and IV) and can dismiss the remainder of the case in its entirety under FRCP 12(b)(1).

   IV.   **The FTSA is unconstitutionally vague, improperly regulates speech, and violates the Dormant Commerce Clause (Counts III and IV)**

   If the Court chooses to exercise its discretion to retain supplemental jurisdiction, Plaintiff's state law claims should be dismissed under FRCP 12(b)(6) as they too fail to state a cause of action. Plaintiff's claims relating to receipt of text messages after Plaintiff texted "stop" (Count III—FTSA Section 5) and the alleged use of an "automated system for the selection and dialing of telephone numbers"[9] (Count IV—FTSA Section 8(a)) fail because the FTSA is unconstitutional. First, the FTSA is vague in that it is impossible for a reasonable person to discern what conduct can be penalized under the terms of the statute. Second, by impermissibly interfering with interstate commerce, the FTSA violates the Dormant Commerce Clause. Third, because the FTSA imposes content-specific prohibitions on speech, it is facially unconstitutional under the First Amendment. Given the constitutional infirmities of the FTSA, Plaintiff cannot assert causes of action under this statute.[10]

---

[9] As noted below, if an "automated system for the selection and dialing of telephone numbers" has the same meaning as an ATDS, then Count IV should be dismissed because Plaintiff does not plausibly allege that an ATDS was used.

[10] Although some of these arguments have been addressed by other District Courts considering motions to dismiss, including in *Turizo v. Subway Franchisee Advert. Fund Tr., Ltd.*, 603 F.Supp.3d 1334 (S.D. Fla. 2022) and *Pariseau v. Built USA, LLC*, 619 F.Supp.3d 1203 (M.D. Fla. 2022), these decisions are not binding, and Peloton respectfully submits that those courts erred in failing to dismiss the complaint in that action. Moreover, the court in *Pariseau* did not address any arguments relating to (1) the vagueness of the meaning of the term "telephonic sales" call; (2) the Commerce Cause concerns raised by the FTSA; or (3) the implications under the First Amendment if intermediate scrutiny applies.

### A. The FSTA is unconstitutionally vague

#### i. *The FTSA provisions at issue*

Plaintiff alleges violations of two sections of the FTSA. Count III alleges a violation of Section 501.059(5), which provides that "[a] *telephone solicitor* or other person may not initiate an outbound telephone call, text message, or voicemail transmission to a consumer, business, or donor or potential donor who has previously communicated to the telephone solicitor or other person that he or she does not wish to receive an outbound telephone call, text message, or voicemail transmission" (emphasis added). "Telephone solicitor" is defined as "a natural person, firm, organization, partnership, association, or corporation, or a subsidiary or affiliate thereof, doing business in this state, who makes or causes to be made a telephonic sales call." § 501.059(1)(i). And in turn, "telephonic sales call" is defined as "a telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." § 501.059(1)(j). The term "solicit" is not defined.[11]

Count IV is brought under Section 501.059(8)(a), which provides that "[a] person may not make or knowingly allow to be made an unsolicited telephonic sales call if such call involves an automated system for the selection and dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party."

The FTSA has a further requirement for any claims by an individual:

> Before the commencement of any action for damages under this section for text message solicitations, the called party must notify the telephone solicitor that the called party does not wish to receive text messages from the telephone solicitor by replying "STOP" to the number from which the called party received text messages from the telephone solicitor. Within 15 days after receipt of such notice, the telephone solicitor shall cease sending text message solicitations to the called party and may not send text messages to the called party thereafter, except that the

---

[11] Here, the FTSA does not contain a severability clause. See generally Fla. Stat. 501.059. Because the FTSA does not contain a severability clause and because the unconstitutional "telephonic sales call" phrase impacts most of the statute, the unconstitutional provision cannot be easily severed thereby permitting the court to eliminate only the unconstitutional provision while leaving the remainder of the statute intact. *See State v. Catalano*, 104 So.3d 1069, 1080 (Fla. 2012).

13

telephone solicitor may send the called party a text message to confirm receipt of the notice. The called party may bring an action under this section only if the called party does not consent to receive text messages from the telephone solicitor and the telephone solicitor continues to send text messages to the called party 15 days after the called party provided notice to the telephone solicitor to cease such text messages.

§ 501.059(10)(c), Fla. Stat.

### ii. *A statute is void for vagueness where it does not inform a person of ordinary intelligence what is prohibited*

Vagueness challenges to state laws are brought under the Fourteenth Amendment's Due Process Clause. *See, e.g., Wollschlaeger v. Governor, Fla.*, 848 F. 3d 1293, 1301, 1323 (11th Cir. 2017). "A law is impermissibly vague if it does not 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly,' or does not provide sufficiently explicit standards for those who will apply it, thereby encouraging 'arbitrary and discriminatory enforcement.'" *U.S. v. Single Fam. Residence & Real Prop.*, 803 F.2d 625, 630 (11th Cir. 1986). "The void for vagueness doctrine addresses at least two . . . due process concerns: first, that the regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is also unconstitutionally overbroad to the extent it can reasonably be read to "authorize the punishment of constitutionally protected conduct." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971) (while city had constitutional power to prohibit some "annoying" conduct, an ordinance prohibiting people from "conduct[ing] themselves in a manner annoying to persons passing by" was unconstitutionally vague and overbroad).

Where, as here, the challenged statute raises First Amendment concerns as discussed further in Section III.B, *infra*, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox Television Stations*, 567 U.S. at 253–54.

### iii. *The meaning of "Automated System for the Selection and Dialing of Telephone Numbers" is impossible to discern*

Section 8(a) of the FTSA (under which Count IV is brought) regulates speech (*i.e.*, "telephonic sales calls") when that speech is made using an "automated system for the selection and dialing of telephone numbers." The problem is that neither Section 8(a) nor any other provision

14

of the statute defines what constitutes an "automated system for the selection and dialing of telephone numbers."

The legislative history of the FTSA provides no further illumination. At no point in time did Florida's legislators discuss what they intended to mean by the phrase "automated system for the selection and dialing of telephone numbers" or define the term.[12] Instead, the legislators referred generally to "autodialers" and the TCPA's "automatic telephone dialing system" language.[13] While the May 25, 2023 amendments to the statute did change the language from "automated system for the selection *or* dialing of telephone numbers" to "automated system for the selection *and* dialing of telephone numbers," it remains unclear whether this revised definition is coterminous with the phrase "ATDS" in the TCPA, or that the term has some other, undefined meaning. If the term "automated system for the selection and dialing of telephone numbers" is coterminous with the TCPA then Plaintiff's claims under Section 8(a) in Count IV fail for the reasons set forth in Section II, *supra*.

If, however, it is *not* coterminous with the TCPA, then the term "automated system" could be interpreted to encompass essentially all modern telephone technology, or some undefined subset of it. For example, any text message or call placed using Siri or any other voice assisted technology on one's cellphone could fall within the scope of an "automated system." But if "automated system" is limited to an undefined subset of modern technology that excludes cellphones and other common systems, a defendant does not have fair notice of what is prohibited under the terms of the statute. The speaker has no way to discern whether the technology on which it is relying is prohibited by the FTSA or not (nor does a judge or jury). As a result, constitutionally protected speech is necessarily chilled.

### iv.     *The meaning of "telephonic sales call" is unclear*

Section 8(a) of the FTSA regulates "unsolicited telephonic sales calls." § 501.059, Fla. Stat. While the term "telephonic sales call," unlike the "automated system" discussed above, is

---

[12] *See, generally*, March 25, 2021 Bill Analysis and Fiscal Impact Statement, available at https://www.flsenate.gov/Session/Bill/2021/ 1120/Analyses/2021s01120.ri.PDF; April 19, 2021 Bill Analysis and Fiscal Impact Statement, available at https://www.flsenate.gov/Session/Bill/2021/1120/ Analyses/2021s01120.pre.rc.PDF.

[13] *See, e.g.,* March 25, 2021 Bill Analysis and Fiscal Impact Statement; April 19, 2021 Bill Analysis and Fiscal Impact Statement.

defined in the statute, its definition provides little insight into what is actually prohibited. "Telephonic sales call" is defined as a "telephone call [or] text message [] to a consumer for the purpose of *soliciting a sale* of any consumer goods or services." § 501.059(1)(j), Fla. Stat. (emphasis added). The phrase "soliciting a sale" is undefined; and thus, the ordinary person is left with no guidance about what—if anything—falls outside of the scope of "soliciting a sale." Further, in her Amended Complaint, Plaintiff alleges that Peloton is a "telephone solicitor," a term defined in the FTSA as any entity that "makes or causes to be made a telephonic sales call" § 501.059(1)(i), Fla. Stat. *See* Am. Compl. ¶ 81. Without a definition of "automatic sales call," how can any individual or business know whether they are a "telephone solicitor" under the FTSA? Because "telephonic sales call" is incorporated into both Sections 501.059(5) and (8)(a), both Counts III and IV are unconstitutionally vague.

### B.      The FSTA violates the Dormant Commerce Clause

The FTSA is also barred by the Dormant Commerce Clause, which limits the authority of the states to enact legislation that impacts interstate commerce. *Healy v. Beer Inst.*, 491 U.S. 324, 326 n.1 (1989). There are two ways that a statute can run afoul of the Dormant Commerce Clause: "(1) by discriminating against interstate commerce or (2) by unduly burdening interstate commerce." *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1244 (11th Cir. 2012). This is because the Commerce Clause "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336–37. Thus, in assessing whether a statute violates the Dormant Commerce Clause, a court weighs whether the benefit of the statute "clearly exceeds the local benefits." *Id.* at 1245. The inquiry boils down to an assessment of what would be "the practical effect of the statute . . . if not one, but many or every, State adopted similar legislation." *Id.*

The FTSA violates the Dormant Commerce Clause because: (1) it purports to regulate conduct that takes place entirely outside of the state of Florida and (2) it unduly burdens interstate commerce.

### i.      *The FTSA regulates conduct with no connection to Florida*

The FTSA purports to regulate extraterritorial commerce in violation of the Commerce Clause as it restricts *all* "telephonic sales calls" throughout the U.S. regardless of where the call is made or received. Specifically, Section 8(a), under which Count IV is brought, applies to any

16

"person" who makes (or allows or causes) any "telephonic sales call" without any geographic limitation on where the call originates or is received. *See* Fla. Stat. § 501.059(1)(j) & (8)(a).

Even if the FTSA's scope is limited to calls placed to persons located in Florida at the time they received the call, the FTSA creates two significant issues. First, the statute creates a rebuttable presumption that a call made to a Florida area code is a Florida resident, § 501.059(8)(d), thus a resident of a state other than Florida who sends a text message (or makes a call) to a person presently residing in a state other than Florida (who happens to use a cellphone with a Florida area code) could potentially violate the FTSA. Thus, the FTSA violates the dormant Commerce Clause because it applies to "commerce" (here, telephone solicitation calls) "that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336. The Florida Legislature recognized this as a potential issue when it enacted the bill, yet failed to take any steps to mitigate it. *See* March 8, 2021 Bill Analysis and Fiscal Impact Statement,[14] ("It is unclear whether the bill's presumption regarding Florida area codes will have an effect on interstate commerce to an extent that has the practical effect of regulating commerce outside of Florida's borders.").

Second, a resident of a state other than Florida who sends a message (or makes a call) to another individual with a non-Florida area code who happens to be located in Florida at the time could also potentially run afoul of Section 8 of the FTSA, despite the caller's inability to know that fact. Faced with a similar statute, a judge in this District concluded that Florida's anti-spoofing law violated the Dormant Commerce Clause. *TelTech Sys., Inc. v. McCollum*, No. 08-61664, 2009 WL 10626585, at *8 (S.D. Fla. July 16, 2009). Judge Martinez reasoned that because a "New York business would be criminally liable . . . when they called the Ohio telephone number" of a person who happened to be located in Florida, the statute made it "impossible" for the caller to know whether the recipient of their call was a Florida resident. *Id.* The court concluded that "[t]he logical consequence of this impossibility is that Plaintiffs are unable to offer Caller ID spoofing services anywhere in the country without risking criminal liability under Florida's statute." *Id.*[15]

---

[14] Available at
https://www.flsenate.gov/Session/Bill/2021/1120/Analyses/2021s01120.pre.cm.PDF

[15] The Florida Legislature specifically acknowledged *Teltech* in concluding that the FTSA posed a significant constitutionality question but did not present an argument as to why *Teltech's* reasoning would not apply to the FTSA when enacting the statute. *See* April 19, 2021 Bill Analysis and Fiscal Impact Statement.

### ii.     *The FTSA unduly burdens interstate commerce*

Assuming that the definition of an "automated system for selecting and dialing" numbers does **not** have the same meaning as applies under the TCPA, *see* Section III.A.2 *supra*, then the FTSA unduly burdens interstate commerce by subjecting national sales calls using "automated" phone systems to inconsistent regulations across the United States. If the FTSA's definition of an "automated system" is not coterminous with the TCPA's definition, then a national sales company would be required to implement different practices for calling Florida customers versus customers elsewhere in the United States. Similarly, a national company with operations in Florida would be forced to fundamentally alter its national practices in order to comply with Florida's requirements.

Where ensuring compliance with a state statute would impose unreasonable expense on out-of-state companies, that statute places an unjustifiable burden on interstate commerce that cannot withstand scrutiny under the Dormant Commerce Clause. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 140 (1970) (holding that state statute that would require an out-of-state company to incur $200,000 in additional expense was an unjustifiable burden). Here, the Florida legislature made no attempt to provide any articulated local purpose that would justify the burdens created by the FTSA. While the Florida Legislature expressed the general concern that "[c]onsumers are often inundated with unwanted calls," citing 293,071 complaints from Florida consumers to the FTC, nothing in the legislative history suggests that unwanted telemarketing calls are unique to Floridians. *See* Fl. Comm. Report on CS/SB 1120, 2021 FL S.B. 1120 (NS), at 2 (Mar. 25, 2021). In the absence of any such justification, the FTSA fails under any balancing test.

### iii.     *The FSTA is unconstitutional under the First Amendment*

Finally, Section 8 of the FTSA violates the First Amendment because it imposes a content-based restriction on speech. Section 8(a) applies only to "telephonic sales calls," defined as a "text message [] to a consumer for the purpose of soliciting a sale of any consumer goods or services." § 501.059(1)(j). But the statute expressly does not apply to commercial speech unrelated to consumer goods or services, such as debt collection phone calls or calls made by a newspaper publisher to solicit advertisements. *See* § 501.059(1)(k). In other words, the prohibitions of Section 8(a) apply ***only*** to certain types of commercial speech.[16] As such, the FTSA is not content neutral.

---

[16] Restrictions on commercial speech are not entitled to a lower level of scrutiny than other types of content-based regulations. *Sorrell*, 564 U.S. at 565–66.

*See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 628 (2020) ("A law is content-based if a regulation of speech 'on its face' draws distinctions based on speaker message.").

Content-based regulations of speech are subject to strict scrutiny, meaning that any such restriction is "presumptively unconstitutional" unless the State can show that the restriction "directly advances a substantial government interest and that the measure is drawn to achieve that interest." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565-66, 571–72 (2011) (applying strict scrutiny standard to statute governing certain types of commercial speech). The Supreme Court has explained that a state can carry its burden by showing either that the law has a "neutral justification" or was intended to "prevent false or misleading speech." *Id.* at 579.

Here, neither safe harbor applies. As noted above, the Florida legislature explained that its purpose in enacting the FTSA was to address the concern that "consumers are inundated with unwanted calls." *See* Fl. Comm. Report on CS/SB 1120, 2021 FL S.B. 1120 (NS), at 2 (Mar. 25, 2021). But there is nothing in the legislative history to suggest that these "unwanted calls" are exclusively—or even primarily—telemarketing such that restricting only this type of speech is warranted. Nor is there any suggestion that commercial sales calls made using an "automated system for the selection and dialing of telephone numbers" is somehow more misleading than non-commercial sales calls (for example, calls soliciting charitable donations or debt collection calls) made without an automated dialer or otherwise. As a result, the content-based restriction that forms the crux of Section 8(a)'s prohibitions is unconstitutional under the First Amendment.[17]

Even if the FTSA were not subject to strict scrutiny it would still violate the First Amendment under a less stringent analysis. Under intermediate scrutiny, the state still must show that there is "a fit between the legislature's ends and the means chosen to accomplish those ends []. [T]hese standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message." *Sorrell*, 564 U.S. at 572. The FTSA still fails under the intermediate scrutiny standard because the Florida legislature only identified a generalized interest in consumer privacy/freedom, which is "too abstract [] to provide a meaningful benchmark for weighing the [automated system provision]

---

[17] To the extent Plaintiff attempts to argue that Section 8(a) does not prohibit commercial speech, but merely imposes certain restrictions (i.e., a consent requirement) and thus cannot violate the First Amendment, that argument is without merit. As the Supreme Court put it, "[l]awmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 566.

against the State's purported interest." *Dana's R.R.*, 807 F.3d at 1249 (rejecting generalized interest in consumer protection to justify content-based commercial speech limits).

Despite recognizing the First Amendment concerns evident in the FTSA, the Florida legislature failed to consider—or even discuss—less restrictive options.[18] Thus, the FTSA is unconstitutional under the First Amendment.[19]

WHEREFORE, Defendants request the Court dismiss the Amended Complaint with prejudice and grant such other and further relief as the Court deems proper.

Dated: October 7, 2025                                        Respectfully submitted,


**K&L GATES LLP**

 */s/ Jonathan B. Morton*
Jonathan B. Morton
Florida Bar No. 956872
Mallory M. Cooney
Florida Bar No. 125659
Jonathan.Morton@klgates.com
Mallory.Cooney@klgates.com
Southeast Financial Center
200 S. Biscayne Boulevard, Ste. 3900
Miami, FL 33131-2399
Telephone:     305-539-3300
Facsimile:     305-358-7095

Joseph Wylie *(Admitted Pro Hac Vice)*
Illinois Bar No. 6270852
Joseph.wylie@klgates.com
70 W. Madison St., Suite 3100
Chicago, IL 60602
Telephone:     312-372-1121


***Attorneys for Defendant***

---

[18] *See* Fl. Comm. Report on CS/SB 1120, 2021 FL S.B. 1120 (NS), at 2 (Mar. 25, 2021).

[19] Here, the FTSA does not contain a severability clause. *See generally* Fla. Stat. 501.059. Because the FTSA does not contain a severability clause and because the unconstitutional "telephonic sales call" phrase impacts most of the statute, the unconstitutional provision cannot be easily severed thereby permitting the court to eliminate only the unconstitutional provision while leaving the remainder of the statute intact. *See State v. Catalano*, 104 So.3d 1069, 1080 (Fla. 2012).

20

21

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel or parties of record on this 7th day of October 2025.

/s/ Jonathan B. Morton
Jonathan B. Morton

21